## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TRACIE EMERSON, in her capacity as Anticipated Administrator of the ESTATE OF ALAN S. WILLISON, JR., deceased,

    Plaintiff,

v.

CLAYTON COUNTY, GEORGIA; CORRECTHEALTH CLAYTON, LLC; LEVON ALLEN, in his official and individual capacity; DONTE BANKS, in his individual capacity; JOSE CALDERIN SANCHEZ, in his individual capacity; MARKEISHA JAMES, in her individual capacity, JONATHAN R. HENRY, in his individual capacity, DELVAN JONES, in his individual capacity, TEVIN E. JONES, in his individual capacity, TERRION D. JONES, in his individual capacity, COREY B. SMART, in his individual capacity, STOKES E. WILLIAMS, Jr., in his individual capacity, BRIANNA S. HARDY, in her individual capacity, DAVID A. JOHNSON, in his individual capacity, THOMAS T. CAMPBELL, in his individual capacity, ROLAND BOEHRER, in his individual capacity, JOHN SIMS, MARY VESSEL APRIL

CIVIL ACTION NO.

1:24-cv-04843-MHC

[JURY TRIAL DEMANDED]

CAMERON, CHARLES CLOPTON,
JR., and DOES 1-10,

　　　Defendants.

## FIRST AMENDED COMPLAINT FOR DAMAGES

**COMES NOW,** Plaintiff Tracie Emerson, as Anticipated Administrator of the Estate of Alan S. Willison, Jr. deceased, by and through undersigned counsel, and hereby files her First Amended Complaint for Damages:

## INTRODUCTION

1.　　This action arises out of the brutal physical assaults and deliberate medical indifference Alan Willison was subjected to as a pretrial detainee at the Clayton County Jail ("CCJ" or "Jail"), which directly and proximately caused him to suffer needlessly and greatly reduced his chance to survive testicular cancer, a highly curable form of cancer with survival rates of 73% to 95%.

2.　　Plaintiff seeks money damages pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq ("ADA"), and state negligence laws.

3.　　Plaintiff asserts a claim for excessive force, deliberate indifference to her son's serious medical need, discrimination based on his disability, and medical negligence.

## JURISDICTION AND VENUE

4.      This honorable Court has jurisdiction over the federal questions involved in this action pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. §§ 12133, 1983, 1988.

5.      The proper venue is the Northern District of Georgia, Atlanta Division, as all acts complained of occurred in Clayton County, Georgia.

6.      Clayton County and the Sheriff's Office of Clayton County were presented notice of Plaintiff's claims, where applicable, within twelve months after Mr. Willison's death; moreover, the respective entities were provided with sufficient information and time to resolve such claims pursuant to O.C.G.A. § 36-11-1 and all other applicable statutory provisions but failed to do so.

## PARTIES

7.      At all times relevant hereto Alan S. Willson, Jr. was a citizen of the United States and a resident of the city of Hudson, Florida.

8.      Plaintiff Tracie Emerson, whose application to be administrator of her natural born son's estate is pending in Pasco County Florida, a true and correct copy of the probate application is attached hereto as "Exhibit A."

9.      Defendant Clayton County, Georgia ("Clayton County" or "County") is a political subdivision of the State of Georgia, a "public entity" within the meaning of Title II of the ADA and is subject to the jurisdiction of the Court.

Defendant Clayton County owns and maintains the Clayton County Jail ("Jail") and is responsible for providing constitutionally adequate conditions for pre-trial detainees and inmates at the Jail, as well as establishing customs and policies for such purposes. Defendant Clayton County had a duty to provide for the medical care of pre-trial detainees at the Jail, including the provision of constitutionally adequate mental health services.

10.    Defendant Levon Allen ("Allen") is the Sheriff of Clayton County. Sheriff Allen is being sued in his official and individual capacity. As a constitutional officer, the Sheriff and deputies in his office have a duty to operate the Jail in a constitutionally sound manner.

11.    Defendant Donte Banks ("Banks") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

12.    Defendant Jose Calderin Sanchez ("Sanchez") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

13.    Defendant Markeisha James ("M. James") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in her individual.

14.    Defendant Jonathan R. Henry ("Henry") was a Clayton County Sheriff's Correctional Sergeant at all times material hereto and is being sued in his individual capacity.

15.    Defendant Delvan Jones ("D. Jones") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

16.    Defendant Tevin E. Jones ("T.E. Jones") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

17.    Defendant Terrion D. Jones ("T.D. Jones") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

18.    Defendant Stokes E. Williams, Jr. ("Williams") was a Clayton County Sheriff's Correctional Officer at all times material hereto and is being sued in his individual capacity.

19.    Defendant Brianna S. Hardy ("Hardy") was a Clayton County Sheriff's Security Specialist at all times material hereto and is being sued in her individual capacity.

20.    Defendant Corey B. Smart ("Smart") was a Clayton County Sheriff's Correctional Sergeant at all times material hereto and is being sued in his individual capacity.

21.    Defendant David A. Johnson ("D. Johnson") was a Clayton County Sheriff's Correctional Lieutenant at all times material hereto and is being sued in his individual capacity

22.    Defendant Thomas T. Campbell ("Campbell") was a Clayton County Sheriff's Correctional Lieutenant at all times material hereto and is being sued in his individual capacity.

23.    Defendant Roland Boehrer ("Boehrer") was the Interim Sheriff of Clayton County. Roland Boehrer is sued in his individual capacity. As a constitutional officer, the Sheriff and deputies in his office have a duty to operate the Jail in a constitutionally sound manner.

24.    Defendant CorrectHealth Clayton, LLC ("CorrectHealth") is and was, at all times material hereto, a private for-profit Georgia Corporation that contracts with Defendant Clayton County to perform a traditional government function under color of state law in the CCJ by providing administrative services, physician care, nursing care, emergency medical and sick-call services, medical records management, and medication management, as well as other related

services, including the provision of mental health services for the Jail's mentally ill population.

25.    Defendant John Sims was, at all times material hereto, a nurse practitioner and private contractor at the CCJ performing a traditional government function under color of state law and was acting within the course and scope of his employment or agency for Defendant CorrectHealth.

26.    Defendant April Cameron was, at all times material hereto, a nurse practitioner and private contractor at the CCJ performing a traditional government function under color of state law and was acting within the course and scope of her employment or agency for Defendant CorrectHealth.

27.    Defendant Mary Vessel was, at all times material hereto, a nurse practitioner and private contractor at the CCJ performing a traditional government function under color of state law and was acting within the course and scope of her employment or agency for Defendant CorrectHealth.

28.     Defendant Dr. Charles V. Clopton ("Clopton") was, at all times material hereto, a medical doctor and the Medical Director at the CCJ and was either jointly employed by or jointly contracted with Defendant Clayton County and/or Defendant CorrectHealth. As the CCJ Medical Director, it was Clopton's job to supervise, train, and monitor the employees and contractors of Defendant CorrectHealth that worked at the Jail.

29.     Plaintiff has been diligent in attempting to learn the identities of all the parties responsible for the wrongdoing herein alleged; however, Plaintiff believes additional parties do exist that are not named due to Plaintiff's inability to discover their identities or the extent of their involvement at this time. To that end, Does 1 through 10 are parties that have not yet been identified but who are liable for the injuries alleged in this Complaint.

## FACTUAL ALLEGATIONS

30.     Alan Willison was booked into the Clayton County Jail on October 26, 2022, as a pretrial detainee for the charge of forgery. He died in custody on January 26, 2023.

31.     Almost immediately upon his arrival at CCJ, Alan was subjected to a severe beating while being processed into the Jail at the hands of Defendant Smart.

32.     His injuries required an urgent referral to the Medical Unit, where it was noted that his face and eyes were swollen and discolored with abrasions.

33.     No incident report or investigation took place regarding Defendant Smart's use of force, nor was Defendant Smart or any other officer ever disciplined for any use of force on Alan.

34.    Alan was placed back in general population on or about October 28, 2022. He had to return to the infirmary on November 16, 2022, after he was brutally beaten again.

35.    This time he was repeatedly kicked and stomped by six to ten inmates for about forty minutes in Housing Unit 8. No officers intervened during this extended, brutal beating.

36.    Defendants James, Banks, Sanchez, Henry, T. Jones, J. Jones and D. Jones were assigned to watch over or guard the inmates where Alan was housed at the time he was beaten.

37.    Defendants Smart, Campbell and Henry had the role of supervising the officers and guarding the inmates in the housing unit where Alan was jumped and beaten.

38.    Alan's face, head abdomen, back and groin sustained serious damage, so much so that he blacked out only to be subjected to more blows and kicks after regaining consciousness.

39.    The medical examination revealed severe swelling of both eyes, back, and trunk eyes bilaterally and multiple contusions to the head, including his forehead. He could not see out of either eye.

40.    No incident reports were created, and no officers were disciplined or investigated for their failure to protect Alan from such a long and brutal beating.

41.    It does not appear that his groin area was examined or inspected even though he reported repeated kicks and stomps to that area.

42.    Defendant Cameron discharged Alan to general population on November 22, 2022, and Defendant Clopton approved of the discharge without physically examining Alan or instructing anyone else to examine him.

43.    Defendant Vessel, a nurse practitioner, wrote that he was in no visible distress on the date of discharge.

44.    However, the next day, Alan pleaded to go to the hospital because of "major pain" with his "private parts" in a written request to Defendant CorrectHealth. The response from Defendant CorrectHealth was that he had already been seen by a nurse practitioner the day before and that Tylenol had been ordered for him.

45.    After this serious complaint, no medical provider examined him. It was not until he complained in writing again of serious issues and pain with his testicles on November 27, 2022, that he was readmitted back to the infirmary.

46.    Despite Alan submitting a written complaint noting that his left testicle was the size of a couple of golf balls, Defendant Vessel wrote that no edema was noted.

47.    Minutes after Defendant Vessel's note, another nurse noted that his left testicle was indeed swollen, and hard. That same nurse gave Alan 800 mg ibuprofen for the pain.

48.    However, Alan's severe and excruciating testicular pain, as well as the swelling and firmness, persisted. When Defendant Sims saw Alan on November 30, 2022, Alan reported the pain in his testicles would not let him sleep or even sit still. It made him have to move around constantly.

49.    No imaging was done on the testicular mass at that time it was noted, nor did Defendant Sims or any other medical provider at CCJ provide Alan any relief for the pain associated with the testicular mass.

50.    While in the infirmary, Alan was in constant pain which only appeared to worsen. On December 2, 2022, he wrote through the medical messaging system used by Defendant CorrectHealth that he needed to see a doctor and reiterated that the pain was unrelenting and would not let him sleep or lay down. He also added that both sides of his lower back were "killing" him, noting that it seemed to be caused by the testicular pain. Alan also noted his observable weight loss.

51.    Several days later, on December 5, 2022, Alan wrote to his jailers and Defendant CorrectHealth that "something must be very wrong" since he was "in excruciating pain everyday on my pelvis, right, left, right back side on lower

half…left testicle and [I] think my blood pressure is bad and [I] need help…. [I] appreciate you and also the pain keeps me from sleeping."

52.    Defendant Sims ordered labs but did not image or request any imaging for the testicular area. When the results of the labs indicated markers for testicular cancer on December 9, 2022, Defendant Sims put in a urology referral request to the referral coordinator, which had to be approved by Defendant Clopton.

53.    Alan was not seen by a urologist until January 19, 2023.

54.    During this time and until his death, Alan remained in excruciating pain. Even after showing markers of testicular cancer, Alan's pain was not stabilized or alleviated.

55.    Alan's impairment caused by his testicular symptoms made him unable to line up for pill call consistently.

56.    He reported that he was not getting his medications.

57.    On December 19, 2022, he messaged his mother through the CCJ's monitored emails to say: "I feel like I'm going to die" and "my organs, and tendons, and back, and side [are] killing me." He expressed the same message to his mother on December 30, 2022.

58.    An ultrasound was performed at CCJ on December 30, 2022, that came back abnormal for the multitude of issues in his testicles and pelvic area. By this time, the mass in his left testicle was size of a "tennis ball," as reported to the

Jail's staff and Defendant CorrectHealth. The pain would not let him sleep, walk normally, or perform other major activities of his daily life.

59.    On January 1, 2023, Alan reported to his jailers and Defendant CorrectHealth the pain was so relentless he felt like "crying" and was "hunched over all the time. [I] never gone through this pain until [I] came to clayton county jail and was jumped and beaten by 6-10 people for 40 minutes while they kept kicking and stomping on the same spot over and over."

60.    On January 17, 2023, he wrote "I need to go to the emergency room. I have sharp pain on my right side and stomach and can't take a full breath. I'm having a hard time with walking."

61.    Alan died nine days later on January 26, 2023.

62.    The urologist who saw him on January 19, 2023, informed the medical and law-enforcement staff at CCJ that Alan needed surgery immediately to remove the left testicle.

63.    Defendant CorrectHealth and its employees or contractors, including Defendants Clopton, Sims, Vessel and Cameron, and/or the referral coordinator, were aware that Alan needed emergency surgical intervention.

64.    The staff at CCJ, including Defendants Boehrer and Allen, as well as the referral coordinator at CCJ, were aware that Alan needed emergency surgical intervention.

65.    No medical providers, directors or personnel from CCJ ever returned the urologist's call or picked up calls to schedule the surgery.

66.    Alan died on January 26, 2023. On the morning of his death at around 4:30 a.m., Defendant CorrectHealth's record show that he was not in acute distress, although at the same time it was noted that Alan complained of shortness of breath, his skin looked jaundiced, and his heart was racing while at rest.

67.    No officers were assigned or present in the infirmary overnight on the date of Alan's death.

68.    When officers finally arrived, Alan was placed in a wheelchair in a hallway in the infirmary where he slid out onto the floor twice. Clayton County Fire & Emergency Services were not notified until over an hour after he was initially found jaundiced and short of breath with a heart rate of 135 beats per minute.

## COUNT I
## EXCESSIVE FORCE

69.    The Rules and Regulations of the Clayton County Sheriff's Office ("CCSO") define reasonable force as that minimal force needed, superior to the opposing force used by a subject, which will enable the officer to establish control over or to prevent or terminate an unlawful act.

70.    The CCSO's Rules and Regulations define excessive force as force that is in excess of that reasonably required to establish control over or to prevent or terminate an unlawful act of violence.

71.    Defendant Smart used force that was objectively unnecessary, unreasonable and in excess of the force reasonably required on Alan Willison while processing him into the Jail.

72.    Defendant Smart struck Alan in the head multiple times in violation of Alan's clearly established Fourteenth Amendment rights.

73.    Defendant Smart's violation of Alan's clearly established rights caused Alan to suffer extensive injuries to his face. The swelling and abrasions to his head required an urgent referral to the infirmary and x-rays.

74.    Defendant Smart's actions were cruel and brutal and caused Alan pain and suffering, including extreme emotional and mental distress prior to his death.

75.    No incident report was submitted for the use of force on Alan by Defendant Smart.

76.    Defendants Campbell, Allen and Boehrer, were acting in a supervisory capacity when they ratified the excessive force of Defendant Smart by not requiring him to report the use of force, by not disciplining his use of excessive force despite knowledge that such use of force put Alan in the infirmary.

77.    The officers and guards at the Jail were aware that Defendants Campbell, Allen and Boehrer tolerated or encouraged use of excessive force.

78.    Defendants Campbell personally participated in covering up the excessive force by Defendant Smart.

79.    Defendants Allen and Boehrer's acts and omissions were causally connected to the injuries and pain suffered by Alan Willison at the hands of Defendant Smart.

80.    Defendants Smart, Campbell, Allen and Boehrer are not entitled to qualified immunity pursuant to 42 U.S.C. §1983.

81.    Plaintiff is entitled to recovery of costs, including reasonable attorney fees under 42 U.S.C. §1983.

## COUNT II
## FAILURE TO PROTECT

82.    Officers and guards at the CCJ had a constitutional duty to take measures to protect Alan from being left unsupervised or unprotected with violent inmates who posed a known and unreasonable risk of violence to Alan.

83.    The inmates Alan were housed with posed a known and unreasonable risk of harm to Alan.

84.    They jumped and brutally beat him for over forty minutes. Despite being beaten so badly he was sent back to the infirmary unable to see out of either eye, with contusions and swelling all over his body, no incident report was ever

submitted detailing who his assailants were, why they beat him so brutally, or what officers were assigned to the housing unit at the time Alan was assaulted.

85.    At the time Alan was incarcerated, officers at CCJ were known to set up inmates they wanted to punish or discipline by placing them with violent individuals or groups that would expose the inmates to a substantially high risk of being physically assaulted, extorted, or both.

86.    Alan reported that six to ten individuals beat, stomped and kicked him repeatedly for forty minutes with no intervention by the guards.

87.    Defendants Smart and Campbell knew that placing Alan in the unit with the inmates who assaulted him posed an unreasonable risk of serious physical violence to Alan.

88.    Defendants Smart, Campbell, Sanchez, Banks and James, Henry, T. Jones and D. Jones individually failed to protect Alan from getting jumped and beaten, and disregarded calls for help or signs that an assault was taking place.

89.    Defendants Smart, Campbell, Sanchez, Banks and James, Henry, T. Jones and D. Jones individually failed to intervene to protect Alan from the extended brutal beating despite having the time and ability to intervene.

90.    Defendants Smart, Campbell, Sanchez, Banks and James, Henry, T. Jones and D. Jones individually failed to submit or create an incident report

because each of them respectively knew it would implicate their deliberate indifference to Alan.

91.    Defendants Smart, Campbell, Allen and Boehrer ratified the unconstitutional acts or omissions of the officers who placed Alan with his assailants, and the offices who were on guard in Housing Unit 8 on the date of the beating, by having knowledge that officers were using violent inmates to discipline and punish pretrial detainees and failing to stop such officers from punishing or disciplining Alan in the same manner.

92.    Defendants Smart and Campbell, Allen and Boehrer are liable for the failure to protect even if they were not individually involved because such officers had sufficient rank and authority for supervisory liability to attach for their acts and omissions that were casually connected to the failure of the guards in Housing Unit 8 to protect Alan.

93.    Defendants Smart and Campbell, Allen and Boehrer ratified the unconstitutional actions of the officers who placed him with his assailants, and the guards in Housing Unit 8 on the date of the incident, and were deliberately indifferent towards Alan's constitutional rights as a pretrial detainee who should not be punished, by failing to require or create an incident report identifying the assailants and the officers or staff who placed Alan with the assailants, and the guards assigned to Housing Unit 8 on the date of incident.

94.     Defendant Clayton County had a custom of policy of not providing constitutionally adequate funding to the CCJ for the CCSO to hire and maintain a sufficient number of guards.

95.     Defendant Clayton County's policy, custom or practice of underfunding the CCJ was the moving force behind the failure to protect Alan from the brutally long beating.

96.     Defendant Clayton County's policy, custom or practice of underfunding the CCJ was also the moving force behind the absence of any officers in the infirmary on the date of Alan's death, and the subsequent delay to Alan's serious medical need caused by their absence.

97.     Because there were no officers in the infirmary on the date of Alan's death, an hour went by from the time Alan was found dying by a nurse before an officer came to assist, which caused a significant delay in the efforts to stabilize or revive Alan.

98.     The delay in his treatment proximately caused Alan to suffer and decreased his chance for an outcome better than immediate death.

99.     The Defendants identified in this Count II violated Alan Willison's clearly established Fourteenth Amendment rights as a pretrial detainee.

100.    The Defendants identified in this Count II are not entitled to qualified immunity pursuant to 42 U.S.C. §1983.

101.    The Defendants identified in this Count II directly and proximately caused Alan Willison to sustain serious injuries and to suffer in pain and are liable to his estate for his pre-death injuries flowing out of such Defendants' deliberate indifference and failure to protect.

102.    Plaintiff is entitled to recovery of costs, including reasonable attorney fees, under 42 U.S.C. §1983.

## COUNT III
## DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEED

103.    Alan required urgent treatment in the infirmary after he was kicked, stomped on and punched all over his body, including his groin area. He was discharged back to the general population on November 22, 2022. The next day he reported severe pain and swelling in his testicles.

104.    He was not taken to see a medical provider at CCJ until November 27, 2022. When he was taken to the infirmary, his testicles were the size of two golf balls, and he was in pain every day.

105.    While housed in Housing Unit 5, Alan was continually denied his pain medication. Due to the severity of the pain and his testicular problems, Alan was often unable to line up for pill calls in the early morning. He informed the guards and the medical providers that he was not getting his medication.

106.    His underlying condition substantially limited his major life activities, including but not limited to his sleep, walking, and bowel movements.

107.   In deliberate indifference to his need for pain medication, the guards in Housing Unit 5 did not provide him with access to pill calls, nor did they make reasonable accommodations for him to get his pain medication.

108.   Even after Alan's condition was known to the guards in Housing Unit 5, Alan continued to be skipped or denied his pain medication. On December 8, 2022, Alan filed a grievance about being skipped after numerous requests for pain medication in November and early December of 2022.

109.   Other inmates were keenly aware that Alan's testicular pain and issues limited his ability to make pill calls and tried to help him

110.   Defendants Williams and Hardy knew that Alan was experiencing pain and symptoms that substantially limited his ability to make pill calls but were deliberately indifferent to the pain and his need for pain medication, by their failure to provide him with access to pill calls or make any other accommodation for Alan to receive his medicine.

111.   Defendants Smart, Campbell, Allen and Boehrer knew that Alan filed grievances and informed guards in Housing Unit 5 about not getting his pain medication but failed to ensure that Alan was provided with access to pill calls, nor did such Defendants provide any other accommodation for Alan to receive his medicine for pain.

112.    Defendants Smart, Campbell, Allen and Boehrer ratified the deliberate indifference of the guards in Housing Unit 5 by not investigating or disciplining the deliberate indifference to Alan's serious need for his medications.

113.    The Defendants identified in Count III herein violated Alan Willison's clearly established Fourteenth Amendment rights as a pretrial detainee.

114.    The Defendants identified in Count III herein are not entitled to qualified immunity pursuant to 42 U.S.C. §1983.

115.    The Defendants identified in Count III herein caused Alan Willison pain and suffering and are liable to Alan Willison's estate for the pre-death pain and suffering directly or proximately caused by their deliberate indifference.

116.    The Defendants identified in Count III herein caused Alan Willison the loss of a chance for an outcome better than immediate death and are liable to Alan Willison's estate for that loss of chance.

117.    Plaintiff is entitled to recovery of costs, including reasonable attorney fees, under 42 U.S.C. §1983.

## COUNT IV
## UNCONSTITUIONAL VIOLATIONS OF ADA

118.    CCJ is a public entity pursuant to 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

119.   Monetary damages are available for violations of the Americans with Disabilities Act that also violate the constitution. *United States v. Georgia*, 546 U.S. 151, 155-160 (2006).

120.   Alan Willison was an individual with a disability within the meaning of Title II of the ADA because he suffered from physical impairments that substantially limited or restricted one or more of his major life activities.

121.   Alan reported his impairments and requested help from officers and staff at CCJ, verbally and in writing, so that he could get his medications.

122.   The officers and staff at CCJ denied him access or failed to make accommodation that would help Alan receive his medications.

123.   As a result of these unconstitutional violations of the ADA, Alan continued to suffer needlessly.

124.   Defendants Smart, Campbell, Allen and Boehrer were of sufficient rank and authority for their acts and omissions, described in Count III, to constitute official acts or omissions of the Clayton County Sheriff's Office and/or Clayton County.

125.   Because the constitutional violations in Count III also violate Title II of American with Disabilities Act, Defendant Allen in his official capacity and Defendant Clayton County are liable to Plaintiff under 42 U.S.C. § 12131 et seq.

## COUNT V
## DELIBERATE INDIFFERENCE TO SERIOUS
## MEDICAL NEED

126.   Defendant CorrectHealth is a private entity that contracts with Clayton County to perform a traditional governmental function of providing health care to inmates and pretrial detainees at CCJ, which includes physical examinations, acute or urgent care and providing necessary medications or referrals.

127.   Defendant CorrectHealth, as well as its employees, agents or contractors, have a duty to provide constitutionally adequate medical care to the inmates at the CCJ.

128.   After he was brutally beaten and kicked in the groin, Alan was placed back in the infirmary. He was discharged in disregard to the pain in his groin area.

129.   Defendant Camerom discharged Alan only for him to request to go to the hospital the next day because he was having "major pain" and "something was wrong with private parts."

130.   Defendant Vessel stated that Alan was not in distress and did not have any complaints on the date of discharge, but just a day later Alan was asking to go to the hospital with major pain in his private area.

131.   Neither Defendant Cameron nor Defendant Vessel physically examined Alan despite reports that he was repeatedly kicked in the groin before discharging him to the general population.

132.   Defendant Clopton also disregarded the need to physically examine Alan or instruct other providers to examine him before discharge.

133.   When Alan complained of major pain in his private areas the day after being discharged from the infirmary, Defendant Sims replied that Alan had already seen a nurse practitioner the day before and did not examine him or request any other medical provider to examine him.

134.   Defendants Cameron, Vessel, Clopton and Sims were deliberately indifferent to Alan's serious medical need for an urgent medical and physical examination.

135.   When Alan was finally readmitted to the infirmary at CCJ on November 27, 2022, his left testicle was the size of a "couple golf balls," and he was experiencing severe pain. From November 23, 2022, until his death on January 26, 2023, Alan never received any relief for his worsening symptoms and the severe and constant testicular pain, nor was he taken to a hospital.

136.   When he was in the infirmary with complaints that his left testicle was hard and the size of two golf balls, his pain was not relieved nor was he sent to a hospital.

137.   When his testis were finally examined and the testicular mass noted by Defendant Sims, Alan complained that the pain would not let him sleep, lay down or even sit still, his pain was not relieved nor was he sent to a hospital.

138.   When he later complained of bowel and urinary disorders, losing weight and that he felt like his "organs are shutting down," his pain was not relieved nor was he sent to the hospital.

139.   When tumor markers for testicular cancer came back elevated, and he felt like he was "dying" and reported that he wanted to cry from the escalating pain that was now also in his sides and lower back, his pain was not relieved nor was he sent to the hospital.

140.   When the ultrasound ordered by Defendant Clopton came back abnormal, and Alan reported he had to hunch over all the time, could not take full breaths, and needed to go to the emergency room, his pain was not relieved nor was he sent to the hospital.

141.   When an outside urologist diagnosed his testicular cancer and recommended immediate surgery, his pain was not relieved nor was he sent to the hospital.

142.   Even on the date of his death, when a nurse reported that Alan appeared weak and jaundiced with a heart rate that indicated his heart was failing him, 911 was not called for over an hour, for a patient that had been diagnosed with testicular cancer.

143.   Not only did Defendant CorrectHealth's employees, agents or contractors, including the referral coordinator, fail to relieve Alan's pain or get

him to a hospital, but they did not even answer or return the calls from the urologist regarding immediate removal of his left testicle, nor did anyone else from the Jail.

144.   Only after Alan died in custody on January 26, 2023, was he taken to the hospital.

145.   Defendant Clopton, Sims and Vessel were aware of Alan's need for pain relief and hospital treatment at every point of their interaction with and treatment of Alan, but each were deliberately indifferent to Alan's serious and increasingly urgent medical needs for pain relief and hospital treatment.

146.   Other Defendant CorrectHealth employees, agents or contractors were deliberately indifferent to Alan's serious need for pain relief, as well as the need to get him to the hospital.

147.   Defendant CorrectHealth had a policy, custom or practice of deliberate indifference to inmates and pretrial detainees who need hospital services, especially when such medical services are necessitated or connected to wrongdoing or misconduct by officers at the Jail.

148.   This policy, custom or practice was the moving force behind the deliberate indifference to Alan's serious need for pain relief or hospital treatment after one officer assaulted him, and after guards cruelly let other inmates brutally assault Alan for forty minutes.

149.   The Defendants identified in Count V herein violated Alan Willison's clearly established Fourteenth Amendment rights as a pretrial detainee by their deliberate indifference to his serious medical needs.

150.   The Defendants identified in Count V herein directly and proximately caused Alan Willison to suffer needlessly and are liable to Alan Willison's estate for the pain and suffering he endured prior to his death.

151.   The deliberate indifference of Defendants identified in Count V herein caused Alan Willison to suffer the loss of chance for better outcomes to a type of cancer with very high survival rates, and such Defendants are liable to Alan Willison's estate for that loss.

152.   Plaintiff is entitled to recovery of costs, including reasonable attorney fees, under 42 U.S.C. §1983.

## <u>COUNT VI</u>
## NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

153.   Defendant CorrectHealth negligently hired and retained Defendant Vessel to provide medical care and skilled services to inmates and pretrial detainees at the Jail despite knowledge of Defendant Vessel's deliberate indifference to the serious medical need of inmates.

154.   Defendant CorrectHealth negligently failed to maintain policies, procedures and budgets for its employees and contractors that would provide for adequate medical care and services to inmates who require hospital treatment.

155.  Defendant CorrectHealth failed to properly train and supervise its employees, agents and contractors, including Defendants Cameron, Vessel and Sims, to provide pretrial detainees like Alan Willison appropriate care, which includes Defendant CorrectHealth's failure to maintain accurate and honest medical records and notes.

156.  As a direct and proximate result of the negligent hiring, training and supervision by Defendant CorrectHealth and by Defendant Clopton, Alan Willison experienced pain and suffering, and loss of chance for a better outcome.

## COUNT VII
## PUNITIVE DAMAGES AND ATTORNEY FEES

157.  The acts and omissions of Defendants described herein constitute willful misconduct, malice, oppression, and an entire want of care, and caused Alan Willison to suffer in pain and the loss of chance of a better outcome, such that Plaintiff is entitled to punitive damages under state and federal laws.

158.  Plaintiff is also entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988 for constitutional claims.

## COUNT VIII
## PROFESSIONAL NEGLIGENCE

159.  Pursuant to O.C.G.A. O.C.G.A. § 9-11-9.1, Plaintiff attaches as "Exhibit B," an Affidavit setting forth the qualifications of the person signing the document, and at least one act of negligence committed by Defendant Cameron, Vessel, Sims and Clopton, and any other medical providers whose acts and omissions are

described in the Affidavit herewith.

160.   Defendants Cameron, Vessel, Sims and Clopton failed to relieve his pain or refer Alan for treatment at a hospital despite his complaints, clinical symptoms, the severity of his pain, and his underlying medical condition.

161.   Defendants Cameron, Vessel, Sims and Clopton, and any other employee, agent or contractor of Defendant CorrectHealth whose acts and omissions are identified in the Affidavit, failed to exercise the required degree of care and skill for their respective profession in the care and treatment of Alan Willison.

162.   Defendants Cameron, Vessel, and Sims failed to exercise the reasonable degree of care and skill ordinarily employed by nurse practitioners under similar conditions and like circumstances in their treatment of Alan Willison.

163.   Defendant Clopton failed to exercise the reasonable degree of care and skill ordinarily employed by medical doctors under similar conditions and like circumstances in his treatment of Alan Willison.

164.   As a direct and proximate result of the negligence by Defendants Clopton, Cameron, Vessel, and Sims, which is identified in the Affidavit, Alan Willison experienced pain and suffering and suffered the loss of chance for a better outcome to a treatable form of cancer with high rates of survival.

## COUNT IX
## VICARIOUS LIABILITY

165.  At all times material herein, Defendants Clopton, Cameron, Vessel, and Sims were employees, agents or contractors of Defendant CorrectHealth and were acting within the course and scope of their employment or agency.

166. Defendant CorrectHealth entered into a contract by and between Defendant Clayton County to provide medical care to pretrial detainees and inmates at the CCJ, and that care must at minimum be provided with the degree of care and skill required under O.C.G.A. § 51-1-27.

167.  Defendant CorrectHealth is vicariously liable for the negligent acts and omissions of Defendants Clopton, Cameron, Vessel, and Sims that were committed in the course and scope of their employment and agency.

168.  Defendant CorrectHealth is vicariously liable for the pain and suffering, as well as the loss of chance, directly or proximately caused by the negligence of Defendants Clopton, Cameron, Vessel, and Sims.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for trial before a jury and judgment against Defendants as follows:

a) That Plaintiff recovers all general, special, compensatory, derivative and punitive damages as well as costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest.

b) That Plaintiff recovers for the expenses of litigation, including for reasonable

   attorney fees and costs pursuant to O.C.G.A. § 13-6-11;

c) That all issues be tried before a jury; and

d) For such other and further relief as this Court deems just and proper.

   This 14th day of November, 2024.

                                           **REYNOLDS LAW GROUP, LLC**

                                           By:    /s/ *Isaac Tekie*
3390 Peachtree Road, N.E., Ste. 1100              Isaac Tekie
Atlanta, Georgia 30326                            GA Bar No. 558190
888.665.0241 (T)                                  Thomas E. Reynolds, Jr.
888.677.1453 (F)                                  GA Bar No. 778864
                                                  *Attorneys for Plaintiff*

**EXHIBIT "A"**

IN THE SIXTH JUDICIAL CIRCUIT COURT FOR
PASCO COUNTY, FLORIDA

PROBATE DIVISION

IN RE: ESTATE OF ALAN S.
WILLISON, JR., Deceased.

                                          File No.

                                          Division

**PETITION FOR ADMINISTRATION**
(Intestate Florida Resident — Single Petitioner)

Petitioner, Tracie Emerson, alleges:

1.  Petitioner has an interest in the above estate as Alan S. Willison, Jr., deceased
    mother and only surviving heir. Petitioner's address is 7411 Duke Drive, Hudson,
    FL 34667, and the name and office address of petitioner's attorney are set forth
    at the end of this petition.

2.  Decedent, Alan S. Willison, Jr., whose last known address was 7411 Duke Drive,
    Hudson, FL 34667, and the last four digits of whose social security number are
    ▉▉▉▉ died on January 26, 2023, at 6;19am. On the date of death, decedent was
    domiciled in Pasco County, Florida, and died intestate.

3.  So far as is known, the names of the beneficiaries of this estate and of the
    decedent's surviving spouse, if any, their addresses and relationships to
    decedent, and the years of birth of any who are minors, are:

| NAME | ADDRESS | RELATIONSHIP | YEAR OF BIRTH [if Minor] |
|------|---------|--------------|--------------------------|
| Tracie Emerson | 7411 Duke Drive, Hudson, FL 34667 | Mother | |
| | | | |

4.  Venue of this proceeding is in this county because Alan S. Willison, Jr. was a
    resident of Pasco County at the time of his death.

5.  Tracie Emerson, whose address is 7411 Duke Drive, Hudson, FL 34667 is qualified to serve as personal representative of the decedent's estate because she has not been convicted of a felony, is mentally and physically able to perform the duties of personal representative, is 18 years of age or older and is a resident of Florida who is related to the decedent as his Mother and only surviving heir and is qualified to serve as personal representative under the provisions of Florida Statutes, section 733.304.

6.  Strike each statement that is not applicable:

    a.  No person has equal or higher preference to be appointed personal representative.

    b.  ~~The following person(s) has/have equal or higher preference to be appointed personal representative and will/will not be served formal notice of this petition:~~

7.  The nature and approximate value of the assets in this estate are: Zero. The decedent did not have any assets upon his death. This estate is being opened for the sole purpose of Tracie Emerson being appointed the personal representative of the decedent's estate to file a claim on behalf of the decedent for a violation of his constitutional rights in the United State District Court, Northern District of Georgia, Atlanta Division.

8.  This estate will / will not  be required to file a federal estate tax return.

9.  After the exercise of reasonable diligence, petitioner is unaware of any unrevoked wills or codicils of decedent.

10. Domiciliary or principal probate proceedings are not known to be pending in another state or country.

Petitioner requests that Tracie Emerson be appointed personal representative of the estate of the decedent.

Under penalties of perjury, I declare that I have read the foregoing, and the facts alleged are true, to the best of my knowledge and belief.

Signed on this 23rd day of October 2024.

Tracie Emerson, Petitioner

James J. Kelleher, Esq.
Attorney for Petitioner


E-Mail Addresses: jkelleher@jimforjustice.com
Florida Bar No: 0047384
Address: P.O. Box 3218, Naples, Florida 34106
Telephone: 239-404-1775

**EXHIBIT "B"**

## AFFIDAVIT DAVID SHEPARD, M.D.

STATE OF GEORGIA

COUNTY OF FULTON

COMES NOW, David Shepard, M.D., after having first been sworn by the undersigned-attesting officer and makes the following Affidavit:

1.

I am David Shepard, M.D, a physician with active licensure in the State of Georgia, I have been continuously licensed as a physician since 2011 and thus was licensed at the time of the negligent acts or omissions described herein. I am board certified in Medical Oncology and Hematology.

I have actual professional knowledge and experience in the area of practice or specialty in which the opinions are to be given in this matter as a result of having been regularly engaged in the active practice of Internal Medicine, Oncology and Hematology for more than the last five (5) years, including for the entire five (5) years preceding the time of the negligent acts or omissions described herein. I have experience in the medical management of patients like or similar to Alan Willison during the time he was under the care of medical providers at the Clayton County Jail, and specifically when he was seen in the infirmary in November and December of 2022, and January 2023, and I have cared for such patients during the five (5) years preceding such dates. More specifically, I have extensive experience in the evaluation, work-up, diagnosis and treatment of patients like or similar to Alan Willison who have a mass and pain related in the testicular area, as well as patients like or similar to Mr. Willison who have elevated markers for testicular cancer.

My training, education and experience is set forth above in my Curriculum Vitae, a copy of which is attached hereto as Exhibit "A," I have appropriate levels of knowledge about the

medical management and care of patients like or similar to Alan Willison so as to be knowledgeable and competent to testify concerning the standard of care of Charles Clopton, M.D., John Sims, N.P., Mary Vessel, N.P., and April Cameron, N.P., and any staff members of CorrectHealth Clayton, LCC, with the ability to order or refer Mr. Willison for pain relief and treatment at a hospital. I am familiar with the standard of care applicable to doctors and nurses who are presented with the clinical symptoms and history Mr. Willison presented with and was actively experiencing while under the care of the above-named medical providers, including during the five (5) years preceding the negligent acts or omissions set forth herein.

2.

Review of relevant medical records and sworn statements is an accepted methodology for investigating whether in a particular patient's case, the medical care and treatment provided the patient met that degree of care and skill utilized by the medical profession generally under similar conditions and like surrounding circumstances. Utilizing this methodology, and in addition to my education, training and experience, my opinions in this Affidavit are based upon my personal review of the following medical records relating to the medical course and treatment of Alan Willison:

(a)     GBI Autopsy Records for Alan Willison;

(b)     Southern Regional Medical Center Records for Alan Willison for January 26, 2023;

(c)     Clayton County Medical Records for Alan Willison from October 2022 through January 2023;

(d)     Georgia Urology Records for Alan Willison dates January 19, 2023;

(e)     Alan Willison's Inmate Request History Detail during his time of incarceration;

(f)     Alan Willison's Email History; and

(g)     Alan Willison's Death Certificate; and

(h)     Complaint filed by Tracie Emerson dated October 23, 2024.

3.

As a result of my educational background, training and experience, I am familiar with the standard of care that is required to be exercised by physicians like Charles Clopton, M.D., as well as the nursing personnel responsible for the medical care of Alan Willison for his complaints about a testicular mass and pain to such medical providers.

4.

Without limitation of the opinions I hold in this matter, it is my opinion to a reasonable degree of medical certainty that Charles Clopton, M.D. deviated from the degree of care to be exercised by physicians in connection with the medical management of Alan Willison as patient. Dr. Clopton's failure to exercise a reasonable degree of care and skill for a medical doctor under similar conditions includes but is not limited to:

(a)     the failure to conduct a physical examination of Mr. Willison's groin area on or about November 22, 2022; and/or

(b)     the failure to properly communicate with or direct other medical staff regarding physical examination of Mr. Willison's groin area on or about November 22, 2022; and/or

(c)     the failure to order images for, or direct medical staff to image, Mr. Willison's testicular area once significant swelling and pain were noted in his left testicle on or about November 27, 2022; and/or

(d)     the failure to refer Mr. Willison for hospital treatment and evaluation of the edema, mass and persistent pain in his left testicle on or about November 30, 2022; and/or

(e)     the failure to refer Mr. Willison for hospital treatment and evaluation of edema, mass and persistent pain in his left testicle when lab tests showed elevated levels of human chorionic gonadotropin (hCG) in Mr. Willison's blood on or about December 9, 2022, and his history of complaints about his persistent pain and the presentation of his clinical symptoms; and/or

-3-

(f)     the failure to refer Mr. Willison urgently for hospital treatment and evaluation of his left testicle once and ultrasound confirmed the abnormalities in his testicle area on or about December 30, 2022, in addition to prior findings and history of the condition; and/or

(g)     the failure to refer Mr. Willison immediately for hospital treatment and evaluation of his left testicle after he was diagnosed with testicular cancer and had extremely high hCG levels on or about January 19, 2023.

These failures on the part of Dr. Clopton show a level of care that is below the requisite standard of care for a medical doctor under similar circumstances.

5.

As a medical doctor who regularly supervises and directs nurse practitioners, as well as registered and licensed practical nurses, and has done so for more than the last five (5) years, including for the entire five (5) years preceding the time of the negligent acts or omissions described, I am knowledgeable and competent to testify about the reasonable degree and skill required by the nurse practitioners who cared for Alan Willison's testicular issues.

6.

Without limitation of the opinions I hold in this matter, it is my opinion to a reasonable degree of medical certainty that John Sims, Mary Vessel and April Cameron, who were and are nurse practitioners to the best of knowledge, deviated from the degree of care to be exercised by nurse practitioners in connection with the medical management of Alan Willison as noted below. Such nurse practitioners' failure to exercise a reasonable degree of care and skill includes but is not limited to:

(a)     the failure to conduct a physical examination of Mr. Willison's groin area on or about November 22, 2022; and/or

(b)     the failure to properly direct or instruct nurses under their supervision to physically examine Mr. Willison's groin area on or about November 22, 2022; and/or

(c)    the failure to order images of Mr. Willison's testicular area once significant swelling, firmness and pain were noted in his left testicle on or about November 27, 2022; and/or

(d)    the failure by John Sims to refer Mr. Willison for hospital treatment and evaluation after lab tests showed elevated levels of human chorionic gonadotropin (hCG) in Mr. Willison's blood on or about December 9, 2022, after Mr. Sims was aware of Mr. Willison's history related to such issue and his clinical presentation; and/or

(e)    the failure to refer Mr. Willison urgently for hospital treatment and evaluation of his left testicle once an ultrasound confirmed the abnormalities in his testicle area on or about December 30, 2022, in addition to prior findings and history of the condition; and/or

(f)    the failure to refer Mr. Willison immediately for hospital treatment and evaluation of his left testicle after he was diagnosed with testicular cancer and had extremely high hCG levels on or about January 19, 2023.

The failures set forth show a level of care that is below the requisite standard of care for nurse practitioners under similar circumstances.

7.

I further have the opinion within a reasonable degree of medical certainty that the deviations of the standard of care as set forth above contributed to the aggressive and fatal progression of Mr. Willison's testicular cancer, a form of cancer that is highly treatable even if detected at late stages. My opinions in this Affidavit are based on a reasonable degree of medical certainty or probability. I specifically reserve the right to amend or supplement this Affidavit as this matter progresses and as further information is learned.

.

FURTHER SAYETH AFFIANT NOT.

DAVID SHEPARD M.D

Sworn to and subscribed before me this

17th day of November 2024

NOTARY PUBLIC

My Commission Expires: 3/19/2028

Gilles Walters
NOTARY PUBLIC
FULTON COUNTY, GEORGIA
My Commission Expires 03/19/2028